Finch, J.
The foundation of this action is admitted to be an averment of deceit and false representation on the part of those who dealt with the bank, both directly and indirectly. That deceit had respect to the solvency of the Southern Construction Company, upon which the drafts were drawn which the bank discounted, and which were "protested for refusal of payment. The solvency of the company was not directly asserted, and no specific inquiry was made about it. The batik officers did not ask who were in fact its incorporators, what was the amount of its capital, how much of that had been actually paid in, or even whether it had, or had not, executed an actual contract "with one qr more railroad companies for construction. No such inquiries were made, but" the bank was led to believe, from what was said, that the construction company had commenced the grading of the new consolidated road"under the Mexican concession, and in so doing was backed and supported by Gould and Sage and other men of wealth and capital; that the money for the enterprise sought to be raised for the purpose on foreign exchanges had been *333 in fact obtained, and that the home capitalists had promised to furnish at least an equal amount. These statements were made by Sampsell, one of the contractors, who had already closed an informal contract with the Southwest Company to build the road from Laredo south to Victoria, and had commenced work in advance of formal papers, in order to comply with the terms of the concession. The statement encouraged a belief in the solvency and financial strength of the Southwest Company, and was corroborated by the representation of Wathen, the engineer who drew the drafts, that they would be paid, and that the .new construction company was backed by the same parties who managed the older ones, and, further, by certain copies of papers which were produced and shown as evidence of the asserted facts. These papers, were, first, a proposition by Sampsell, addressed to Dodge as president of the American Railway Improvement Company, that if “the new company” would continue his present contract at the same prices to Victoria, and pay him the $13,000 due from the Oriental Company, and allow him to put his forces “ to work at once,” he would waive his demands for lay-off, and complete the work to Victoria in a reasonable time. Indorsed on the proposition appeared these words: “I recommend the acceptance by the new company of the inclosed proposition. [Signed] Jay Gould. R. Sage. U. S. Grant.” The second paper produced to the bank was a letter from Dodge to Gould, which indorsed Sampsell’s proposition, and gave it approval as being a “fair one.” Each of these papers bore the date of July 9, 1883. the third paper shown was dated the next day, was addressed to the contractors, and authorized "them to build to Victoria upon the terms of the original contract. It was signed “ George J. Gould, President Southwest Con. Co., per J. H. Work, Secretary;,” but the latter had no authority whatever to sign the president’s name to the paper, he at the time being in Europe, and wholly ignorant of the use made of his name. The fourth paper shown was dated J uly 12, 1883, directed to Wathen as chief engineer, and signed by Work as secretary of the Southwest Company. It ordered the engineer, when he drew for the contractor’s August estimate, to include the amount due from the Oriental Company. The fifth paper was dated a day earlier, and was a notification to the contractors that they had been awarded the contract for grading the Mexican Southern Railroad south to Victoria at certain named prices, the work to commence by July 14th, and was also signed by Work in the name of George J. Gould, but without authority. It was in reliance upon these papers, and the statements of Wathen and Sampsell, that the bank discounted the drafts which were protested. All the information which these two persons gave, so far as it concerned facts rather than mere opinions, was derived from Work. The proof tends to show that he did represent to Sampsell that the money had been subscribed abroad, and was to be supplemented by an equal amount from Gould and that the road was to be built by the parties interested in the two previously existing companies, which were to be consolidated for the purpose of utilizing the new concession. There was thus disclosed *334 enough to raise a question of fact as to Work, for, while he had no direct communication with the bank, he set in motion, and was more or less responsible for, the> untrue and incorrect statements upon which the bank acted. The trial court so held, but dismissed the complaint as to the other defendants, and it is from that ruling, as it respects Gould, Sage, and Dodge severally, that this appeal is taken; and the question is whether they became responsible for the false representations which misled the bank.
It is not claimed that either of such defendants communicated directly with the bank officers, or ever knew of what was transpiring when the drafts were drawn, and it is admitted that the inducement to the discount came primarily from ■ Sampsefl and Work, so that the burden is on tlie plaintiff to connect- the defendants with the representations made in such manner as to attach a responsibility for their truth and liability for their consequences ; and to effect that it became necessary to show — First, that the defendants made false representations to Work and Sampsell; second, that they made them with the expectation and intention that Work and Sampsell should repeat them to the parties whose money was to be obtained; and, third, that the defendants knew the statements to be false. None of the defendants .made either to Work or Sampsell the alleged representations. None of them told Work, at any time or anywhere, that the funds sought in foreign markets had been obtained. Why should they ? The agency for that purpose was wholly in the control of Work, and all the knowledge possible was his. They said nothing about it relative to the facts occurring, because what information, if any, reached them, came from him as the author and manager of the scheme. Sage never uttered a word on the subject; Dodge does not appear even«to have known that such an effort was in progress, and all that Gould ever said was that, if six millions was subscribed abroad, he would add as much more to the enterprise. No one of the three said at any time, or to any person, or for any purpose, that the foreign money had been in fact secured. How much Gould may have known ' about the progress . of the negotiations abroad, how much he may. have been desirous of their success, or to what extent he may have aided ,in them, are matters open to discussion; but lie never stated their result, truthfully- or untruthfully, to anybody, or authorized, directed or encouraged such statement by Work. That fact was the one upon which the success or failure of the enterprise depended, and which must have been the chief reliance of the bank; but the falsehood, if it was uttered, came solely from Work, and no one else.
Nor did either of the three defendants in any manner assert the solvency of the Southwest Company, or authorize anybody to assert it, or contemplate the making of such a statement That company was organized by*Work as an Iowa corporation. He manned it with his own clerks, relatives, and friends. Prior to its organization the utility of forming such a company was admitted by Gould, at whose suggestion his son was named as president Gould and Sage undoubtedly encouraged its creation, and meant, if the capital sought could be obtained, to use it as the agency of *335 construction ; but until then they had no responsibility for it, no control of it, and no interest in it. Gould and Sage touched it only once, and at a single point. Sampsell sent them a proposition to make a contract with the Southwest Company for construction. They had not asked him to do so, or said a word to induce him to such action. They had a right to believe that he had investigated for himself the character of the company with which he was seeking to contract, and was willing to take whatever of risk was inseparable from his conclusion. All they were asked to do was to influence the company, and not Sampsell. He had determined, but the former had not. Gould and Sage thereupon recommended to the company an acceptance of the proposition. Their statement was to the company, and to that only, and was advice intended solely for those to whom it was directed. It in no manner represented or asserted the solvency of the company. It was not asked for that purpose, or given with that intention,or contemplated to be used or to operate beyond its terms. It said, in substance, that, since Sampsell desired to contract with the company, the subscribers were content to have the company contract with 1dm. They said that, not as members of the corporation, but as persons likely in the future to become such members, and said it for the company to act upon it in the only usual and corporate manner, and with all needed terms and conditions. There was about it no representation of any fact bearing upon the responsibility of the company, and it is obvious that it was not contemplated or intended to influence any one except the company to which it was directed. Its aim and its office went no further, and ended there. But even this recommendation was not followed, and wlmt was done became an utter departure even from the advice tendered. Ho contract was in fact made. The plaintiff so argues. The company never acted, but Work, in the presence and with the knowledge of Sampsell, signed George Gould’s name as president to a temporary ami invalid agreement, and Sampsell took it to the bank, and presented it as honest and valid. With the fraud of Sampsell, neither Gould nor Sage had any connection, and were not even cognizant of it at the time. Fraud and deceit are to be proved, and there is no evidence here of any word or act on the part of Gould and Sage which made them responsible for the after and unknown and undirected action of Work and Sampspll.
The case is equally barren of proof as against Dodge. The only statement ever made by him was not one of fact, but of opinion respecting the future, which he honestly believed to be correct, and was entirely excusable for so believing. He did say to Sampsell that the parties interested in the old roads would build the new, and, with the facts known to everybody about the recent concession, the opinion expressed was natural and reasonable. But he represented no fact of any kind, and his dealing with both Sampsell and Wathen, the engineer, is open only the criticism that he fully believed that an event would occur in the future as to which he was too sanguine and hopeful. He deceived nobody, and misled nobody, by any assertion of fact which was *336 untrue. He never said that the money was obtained for the enterprise, or that the new coihpany was solvent, or professed to have any knowledge of either fact. He had frankly stated his intention to go out of Mexico and discontinue his connection with operations there, and said quite enough to prevent a supposition that he represented anybody engaged in the further enterprise, or had information not common to all. His friendship for the engineer and for the contractors with whom he had previously been associated, and to some extent his own direct interest, led him to aásist each in an effort to retain their places under the changed conditions which Ije fully believed were about to occur, and he did so with somewhat more of confidence in the outlook than actual results justified; but he told no falsehood, misrepresented no fact, believed in the opinion which he expressed, and was not guilty in any direction of deceit or fraud.
I have not sought to follow the arguments made through their numerous details, or to refer to a great number of minor facts which appear in the recordbut there is one among them which deserves some further attention, and which is" the necessity, obvious to all the parties, of an immediate resumption of work bn the line in order to" save the concession. The inference deduced is that, when Sampsell’s proposition was brought to Gould, it showed on its face a purposed to begin work before the concession expired; that Gould knew of that purpose, and, knowing also that the whole enterprise was yet in doubt and not assured, should have warned Sampsell of his danger, and told him the truth. But Gould did not know that Sampsell was being at all' misled. There is no indication that the former suspected Work of having deceived the contractor, or of having stated to him anything but the truth. Gould was at liberty to believe that Sampsell, after due investigation, was willing to trust the, Southwest Company, and prepared, in view of -the possible profits, to take whatever of risk was involved in his proposition. Yery likely, at the moment, and in view of the existing indications, Gould himself thought that risk was slight, and the action of the contractor no more imprudent than occurs daily among careful men in taking business risks. But, in any event, Gould was not called upon to advise Sampsell, or to suspect that the latter was being misled or acting under a mistake as to the facts. Gould had not, either directly of indirectly, induced the proposition, or encouraged Sampsell to make it, or been called upon for advice on, the subject, and was under no obligation to seek him out and yrarn him against the possible risks of his offer. But I should not unduly prolong the discussion. I have read the case carefully, and am quite satisfied that the question involved was correctly determined.
The judgment should be affirmed, with costs.
All concur.
Judgment affirmed.